# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

THE PERSON OF MALIK T. HILL, B/M, FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1201(a)(1)

Case No. 21-sw-299

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

MALIK T. HILL, B/M, DOB: 04/29/1997, PDID: 752-275, who is in the custody of law enforcement.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized):*

a buccal swab from the defendant's mouth.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201(a)(1) | Kidnapping |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ERIC WALSH, DETECTIVE, D.C. METROPOLITAN POLICE DEPARTMENT
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 09/09/2021 _____

_____
*Judge's signature*

City and state:  Washington, D.C.

ZIA M. FARUQUI, U.S. MAGISTRATE JUDGE
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of )<br><br>THE PERSON OF MALIK T. HILL, B/M, FOR INVESTIGATION OF )<br>VIOLATION OF 18 U.S.C. § 1201(a)(1) )<br>)<br>)<br>) | Case No.  21-sw-299 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location)*:

MALIK T. HILL, B/M, DOB: 04/29/1997, PDID: 752-275, who is in the custody of law enforcement.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

a buccal swab from the defendant's mouth.

**YOU ARE COMMANDED** to execute this warrant on or before      September 22, 2021      *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      Zia M. Faruqui      .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    09/09/2021                              _____
                                                                                      *Judge's signature*

City and state:   Washington, D.C.                    ZIA M. FARUQUI, U.S. MAGISTRATE JUDGE
                                                                                      *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 21-sw-299 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

                       _____
*Executing officer's signature*

                       _____
*Printed name and title*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE
SEARCH OF THE PERSON OF          Case No. 21-SW-299
MALIK T. HILL, B/M, FOR
INVESTIGATION OF
 VIOLATION OF 18 U.S.C. § 1201(a)(1)


AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Eric Walsh, a Detective with the Metropolitan Police, hereinafter the Affiant, being duly sworn, deposes and states as follows:

**AGENT BACKGROUND**:  I am a detective with the D.C. Metropolitan Police Department ("MPD"). I have been in this position since 2013 and employed by the MPD since 2004. While assigned to the MPD's Youth and Family Services Division ("YSFD"), I have attended training in numerous states on a yearly basis. I have successfully applied for search and arrest warrants that have led to successful prosecution of cases in both DC Superior Court and United States District Court. As a detective, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

**SUBJECT:** **For the person of MALIK T. HILL, B/M, DOB: 04/29/1997, PDID: 752-275**

**INVESTIGATION:**

On April 21, 2021, at approximately 7:40 a.m., an adult female identifying herself as the mother of T.L., a sixteen-year-old female with a date of birth in 2004 (the "Complainant") contacted MPD to report that the Complainant needed medical assistance at XXX Southern Avenue, Apartment 403 in Southeast, Washington, D.C.

At approximately 8:32 a.m., the Complainant's mother, MPD officers, and members of the District of Columbia's Fire and Emergency Medical Services ("DC FEMS") responded to the address and attempted contact with the Complainant. MPD and DC FEMS officers subsequently breached the door to the residence after they heard noises coming from inside of the apartment but could not get anyone to open the bolt-locked door. Once inside, MPD officers located the Complainant, who was laying underneath a blanket on the bathroom floor of the residence. The Complainant was naked underneath the blanket. She was groaning and appeared to be in severe pain. Additionally, the Complainant was, at times, unresponsive, seemingly occasionally losing consciousness.

On scene, the Complainant reported to MPD officers that she had been assaulted by several unknown males who had followed her into the home after she walked her dog. The Complainant advised that one of the unknown males stated, "where the shit at?" The Complainant reported that

1

she was knocked unconscious during the assault. After the Complainant regained consciousness, she locked the front door and attempted to take a shower but instead passed out on the bathroom floor. When the Complainant regained consciousness again, she contacted a family member who then contacted the Complainant's mother. When asked on scene, the Complainant indicated that she was not sure whether she had been sexually assaulted. The Complainant said that she did not know who had attacked her. The Complainant's mother told MPD officers on scene that a television and two security cameras were missing from the apartment.

The Complainant was transported to Children's National Medical Center ("CNCM") by DC FEMS for treatment. There, she was interviewed by medical personnel and by an MPD detective. The Complainant reported that, on the evening of April 20, 2021, she attended a vigil for her boyfriend, who had recently been killed. After the vigil, she went to a neighbor's residence. Around 11:45 p.m., the Complainant realized that her dog needed to be walked. The Complainant returned home from walking her dog when six individuals followed her to her apartment and kicked in the door. The Complainant reported that all of the individuals began to kick and punch her in the head and face. The Complainant saw the individuals assaulting her dog before she eventually lost consciousness. The Complainant reported losing consciousness several times over the course of the assault, which she estimated lasted about an hour. The men said things such as "we should kill her." One man took her phone and, while searching through it, began saying out loud where her family lived and where she went to school. The men also took jewelry from her body. The Complainant reported that she did not know how long she was unconscious for, but advised she called a friend shortly after she regained consciousness. The Complainant was unable to describe the men, explaining that it happened so fast. She remembered that, except for one man, they were all tall. She also recalled that the men had guns.

Because of her inability to recall whether she had been sexually assaulted, medical personnel offered to do a sexual assault examination. The Complainant agreed, and a Physical Evidence Recovery Kit was collected by a Sexual Assault Nurse Examiner ("SANE"). The SANE noted during the examination that the Complainant had bruising behind her right ear, left arm, right shoulder, and lips. The Complainant also had a small laceration to her upper lip.  In general, the Complainant appeared to be traumatized.

On April 22, 2021, after the Complainant had been released from the hospital, the Complainant was interviewed by a Seventh District ("7D") MPD detective. During this interview, the Complainant largely provided the same story. She explained that she used to date a person named "Dirty." The Complainant advised that "Dirty" had been the victim of a homicide the previous week.

On the night of the assault, the Complainant walked back to her apartment with her dog when "a whole rack of people kicked the door in." The Complainant later advised that there was a total of six people in her apartment. The Complainant reported that her dog bit one of the people on the leg or pants. The dog was thrown against a wall and then locked in a bedroom. The people asked her where the "stuff" was before repeatedly assaulting her. The Complainant advised that she did not know the people and that they were all wearing black clothing with ski masks covering their faces except for their eyes. Some of the men were wearing gloves. The Complainant initially said that she had not seen anyone with a gun, but later reported that one of the people pulled a gun and

pointed it at her dog. The Complainant also stated that she had been hit in the head with a gun. The Complainant reported that they stole a television, necklace, and bracelet from the apartment and that the men went through her phone. The men threatened to harm her if she told anyone. The Complainant was kicked in the face and lost consciousness.

Shortly after the interview with the 7D detective was complete, the Complainant told the 7D MPD detective that she had not been truthful with him. In subsequent interviews, the Complainant gave a more truthful and complete statement. A second interview was conducted on the same day, April 22, 2021, with the same detective. The Complainant was interviewed once more on April 22, 2021 by a separate set of MPD detectives and again on April 26, 2021 by a detective assigned to the MPD YFSD. The April 26, 2021 interview was the most detailed, as outlined below.

The Complainant confirmed her address and told MPD detectives that she had dated a man named "Dirty" for approximately a month and half before he was shot and killed on Wheeler Road on April 15, 2021. A few days before he was killed, "Dirty" had given the Complainant a Pink brand bag. "Dirty" told the Complainant to take the bag into her apartment and to not look into it. The Complainant brought the bag to her apartment and immediately looked inside. The Complainant saw two guns and a small bag with white powder.

The day after she learned that "Dirty" had been killed, the Complainant posted to Instagram live a video of herself smoking marijuana and holding the guns that were in the bag given to her by "Dirty." The video was posted on Instagram live at approximately 3:00 a.m. on April 16, 2021. The Complainant kept a copy of the video on her phone, which she showed MPD detectives.

Within a day of posting the Instagram video, the Complainant's cousin contacted her and told her that she needed to get the guns out of her house. The cousin advised that he would take them from the Complainant, which he did a couple days prior to a candlelight vigil for "Dirty" on April 20, 2021.

On April 20, 2021, the Complainant attended the candlelight vigil for "Dirty." Afterwards, she returned to her neighborhood in the 800 block of Southern Avenue, Southeast. A group of no more than approximately 20 individuals gathered in the parking lot of her apartment building. While in the parking lot, DeMarco Allgood ("Allgood") approached the Complainant and asked her, "You the girl that Dirty used to fuck with?" The Complainant told Allgood that she was, and Allgood asked her if "Dirty" had left anything with her or in her house. The Complainant told Allgood that she would check later, and Allgood took the Complainant's phone and put his number into her phone. Allgood called his number from the Complainant's phone so that he had the Complainant's number.

The Complainant returned to her apartment and was hanging out with a friend (who ultimately left the apartment before the assault began). A short time later, at 10:27 p.m., Allgood called the Complainant and he started questioning the Complainant as to why she had not called him and why she was trying to avoid him. The Complainant made up an excuse to get off the phone with Allgood.

The Complainant received a text message from Witness 1 at approximately 11:17 p.m., and Witness 1 told the Complainant that she was coming over to the Complainant's house. Witness 1 arrived approximately twenty minutes later. Shortly after Witness 1 arrived, around approximately 11:48 p.m., Allgood again called the Complainant. The Complainant pretended her phone was messed up during this call, but Allgood called back at 11:54 p.m. and asked about the stuff "Dirty" left with her. The Complainant told Allgood that she only had some "white stuff" and Allgood told her to bring it outside. The Complainant met Allgood outside and turned over the "white stuff." Allgood told the Complainant to let him know if she found anything else in the house.

The Complainant reported that Allgood was outside with a man she recognized as "Nae Nae" (later identified as Nathaniel Holmes), as well as a light skin skinny male wearing a black hoodie with something on the front of the hoodie (Target 5), and a fat guy wearing a gray hoodie, later identified as Malik Hill.

The Complainant returned to her apartment and Witness 1 was still there. Witness 1 left shortly after the Complainant returned. The Complainant reported that someone knocked on the door soon after Witness 1 left. The Complainant looked through the door's peep hole and saw only Witness 1. The Complainant opened the door and Allgood, Holmes, Hill and Target 5 (the "defendants") pushed the door open and rushed into her apartment. Allgood said to the Complainant, "Where that shit at?" The defendants pushed the Complainant through the house and searched her home. The Complainant believed that the defendants were trying to find the bag "Dirty" gave her.

The defendants pushed the Complainant back into the living room of the home and stood over the Complainant yelling at her and demanding to know the location of the guns. Allgood physically assaulted her and said that they knew "Dirty" gave her the guns. Hill stated that they should just kill the Complainant. The Complainant observed a two-tone black in color handgun on the small of Hill's back.

Witness 1 was present for the assault of and threats to the Complainant but did not participate.

The Complainant reported that she was scared and told the defendants that she had given the guns to her cousin. The defendants made the Complainant call her cousin several times starting at 12:10 a.m. on April 21, 2021, until he answered with the phone on speakerphone. The Complainant told her cousin, "where the stuff at, because they are about to kill me," or words to that effect. The Complainant reported that Holmes knows the Complainant's cousin, and he told her cousin that if the "stuff don't turn up, she dead," or words to that effect. The Complainant's cousin denied having the guns. The Complainant told the defendants that her cousin was lying.

The Complainant's cousin requested that he be taken off speakerphone and told the Complainant that the defendants were faking and were not going to hurt her. The Complainant reported that she begged her cousin to tell the defendants because she thought they would kill her. Allgood told the Complainant's cousin that if the defendants did not have the guns in forty minutes, they would kill the Complainant. Allgood then hung up the phone.

4

The Complainant advised that Holmes then called a woman whom they referred to as "Dirty's baby momma."[1] and told her to come over because they had something to handle. A woman later identified as Donaesha Hawkins arrived at the apartment shortly thereafter. When Hawkins arrived, one of the defendants told her that the Complainant had "Dirty's shit" and would not tell the defendants where it was. Hawkins took off her jacket and started to hit and punch the Complainant all over her body. Hawkins kicked the Complainant in the knee, causing her to fall to the ground. Hawkins kicked the Complainant while she was on the ground and then Allgood pulled the Complainant to her feet by the Complainant's hair so that Hawkins could continue beating the Complainant.

The defendants then questioned the Complainant about where the guns were located. Eventually, the group forced the Complainant out of the apartment and to the parking lot. One of the defendants told the Complainant to stand next to a specific car and that they would kill her if she moved. Eventually, the Complainant then got into a car with Holmes and Witness 1, and they left the apartment complex.

The defendants took three different vehicles, with Holmes, the Complainant, and Witness 1 in what the Complainant described as an orange or peach four-door Kia. Allgood and Hill rode in an older red four-door car. Target 5 rode in a gray two-door car the Complainant described as an Infiniti.

Holmes stopped prior to leaving the District of Columbia and dropped off Witness 1. Neither Hawkins, nor Witness 1 accompanied the group to Maryland.

After dropping off Witness 1 near her residence, the Complainant then directed Holmes to Suitland Parkway, and then to an apartment complex in Suitland, Maryland where she believed the guns were located. The other two vehicles followed. The defendants did not attempt to enter the apartment in Maryland. Instead, after the Complainant pointed out the building, the group decided to return to the District of Columbia.

Holmes quickly drove the Complainant back to the District of Columbia. Holmes spoke with someone on the phone on the way back. The Complainant believed Holmes was talking to the other defendants. Holmes told the Complainant that he had been driving quickly because the other defendants wanted to kill her. The Complainant explained that this did not make sense to her because Holmes told the other defendants to meet back at the Complainant's apartment complex. Regardless, Holmes told the Complainant that he saved her life.

Holmes drove back to the Complainant's apartment complex where Holmes met up with the other defendants, including Allgood and Hill. The Complainant reported that Allgood displayed a firearm and said that if the guns do not show up in two to three days, he would kill her. All the defendants except for Holmes then drove off.

---

[1] The Complainant told MPD Detectives that though the defendants referred to defendant Hawkins as "Dirty's baby momma," the woman looked different than the woman who identified herself as the mother of "Dirty's" child at the candlelight vigil. A subsequent law enforcement investigation confirms that defendant Hawkins is not the mother of any of Dirty's children.

The Complainant and Holmes returned to her apartment. Holmes got a rag and began to clean blood off the Complainant's face. Holmes walked into the bathroom and turned on the shower and told the Complainant to take a shower. The Complainant, still fearing for her life and in severe pain, obeyed. Afterwards, the Complainant returned to her bedroom wearing only a towel. The Complainant was not able to put her clothes on because Holmes had put all of her clothes into a bag. The Complainant walked to a mirror in her bedroom and started looking at the bruises on her body. Holmes then approached the Complainant from behind started kissing and touching her shoulders. The Complainant told him no, and Holmes responded, "I just saved your life. You could do something…. just come on," or words to that effect. Holmes became irritated and told the Complainant that he just did all of this for her.

The Complainant walked away from Holmes, who followed her and pushed her over the bed with her chest facing into the bed. Holmes removed the towel the Complainant was wearing and began kissing and touching her body. Holmes pulled his pants and underwear down and ordered the Complainant to get a condom, which she did. Holmes removed the condom from the wrapper, placed it on his penis and then forced his penis into the Complainant's vagina against her will. The Complainant disclosed that Holmes put his "dick" inside of her and it was "hard" and "it hurt." The Complainant reported that the assault lasted approximately twenty to thirty minutes.

The Complainant reported that Holmes finished and walked into the bathroom to clean himself. The Complainant advised that Holmes returned to the bedroom and ordered the Complainant to get on her knees in front of him. The Complainant stated that she told him no and Holmes threatened to call back the other defendants to hurt her. The Complainant begged Holmes not to call the other defendants and the Complainant got on her knees. Holmes placed one hand on the Complainant's neck and another on her head as he forced her down to his penis. Holmes then told her to "suck it" and forced his penis into the Complainant's mouth against her will. The Complainant stated that Holmes penetrated the Complainant's mouth with his penis for approximately fifteen minutes, until he told her to stop.

Holmes told the Complainant that he was going to McDonald's and that he would bring her something back. He told the Complainant not to talk to anyone. Holmes also told the Complainant that if he called, she better answer the phone. The Complainant was afraid that Holmes would return with the other defendants and was scared that they would come back to the apartment to further assault her. The Complainant reported that she was also afraid to leave because she was afraid the defendants were still outside or would come back. The Complainant attempted to contact Holmes several times via a telephone number for Holmes that had been stored in her phone prior to April 20, 2021, but Holmes did not answer. At one point, Holmes finally answered, asking the Complainant what she wanted from McDonald's. The Complainant reported that Holmes returned to her apartment with McDonald's for her. Holmes left after dropping off the food. Fearing that she would be harmed further if she did not follow Holmes' instructions, the Complainant called Holmes over 20 times between the time when he left to get McDonald's and when MPD officers arrived at her apartment later that same morning.

The Complainant eventually called a friend, who got in contact with some of the Complainant's family members. This phone call led to MPD and DC FEMS officers responding to her apartment.

Surveillance footage from the Complainant's apartment complex shows that, on April 20, 2021, at approximately 11:52 p.m.[2], Allgood, Holmes, and Hill walked up a walkway away from a parking lot towards XXX Southern Avenue, appearing to follow the Complainant. These individuals then entered XXX Southern Avenue.

Thirty minutes later, at approximately 12:24 a.m., a four-door sedan backed into a parking spot and Hawkins exited the vehicle, walking, then running up the walkway to XXX Southern Avenue before entering the building.

At approximately 12:31 a.m., multiple individuals, including Allgood, Holmes, Hill, Hawkins (wearing a red puffer jacket previously observed worn by the Complainant), Target 5, and the Complainant exited XXX Southern Avenue and entered the parking lot.

The Complainant was upset and injured and wiping at her face. At one point, an additional woman walked behind the Complainant and struck the Complainant several times about the face and body, causing the Complainant to bend over in severe pain.

Between 12:32 a.m. and 1:00 a.m. on April 21, 2021, as ordered by the defendants, the Complainant stood in the parking lot with Allgood, Holmes, Hill, Hawkins, Target 5, and several other individuals. The Complainant rubbed her face with her hand, eventually walking to the SUV with Holmes. Allgood and Hill entered a red four-door Sedan and Target 5 entered a grey two-door vehicle. All three vehicles left the parking lot together and returned at approximately 1:49 a.m.

At approximately 1:51 a.m., the Complainant and Holmes exited the SUV and walked to the red four-door sedan where they appear to be talking to someone inside the vehicle through the open front passenger side window. At approximately 2:04 a.m., the Complainant and Holmes walked towards XXX Southern Avenue and entered the building.

At approximately 2:51 a.m., Holmes exited XXX Southern Avenue and returned to the SUV. An unidentified individual got into the passenger side of the vehicle, and the vehicle left the parking lot at approximately 3:00 a.m. On April 21, 2021, at approximately 3:22 a.m., the vehicle returned to the parking lot and parked. At approximately 3:26 a.m. Holmes exited the driver side with what appear to be fast food bags and a drink cup and headed towards XXX Southern Avenue.

On May 20, 2021, the Complainant was shown several still shots and a video clip from the surveillance footage.[3] The Complainant identified herself, Allgood, Holmes, Hill, Hawkins, and Target 5 in the footage. Upon seeing Target 5, the Complainant stated, "that's right he had white on his sleeves not on the front," or words to that effect, and pointed to white stripes on the sleeves

---

[2] The security personnel who provided the surveillance footage to MPD have advised that the time stamp visible on the footage is one hour behind the actual time. The time referenced throughout this document is the actual time.

[3] More than a week prior, on May 11, 2021, the Complainant identified Allgood, Holmes, Hill, and Hawkins in separate photo identification procedures.

of the black sweatshirt worn by Target 5. The Complainant had previously described Target 5's hoodie as black with writing on the front.[4] Additionally, on April 22, 2021, the Complainant described Holmes as wearing a Kufi. Surveillance footage indicates he is wearing a baseball cap. The clothing descriptions previously provided by the Complainant to law enforcement otherwise matched those which were seen in the surveillance footage.

Also on May 20, 2021, the Complainant identified the SUV in the surveillance footage as the Kia in which Holmes drove her to Maryland and further stated that the vehicle belonged to Holmes' girlfriend, with whom the Complainant is familiar and who resides in the Complainant's building, XXX Southern Avenue. The Complainant was shown a driver's license photograph for the girlfriend, whom the Complainant immediately identified as Holmes' girlfriend and the owner of the vehicle. The Complainant was shown a photograph of a Ford Escape identified by law enforcement as the car driven by the girlfriend, and the Complainant identified the Ford Escape as the vehicle that she had initially described as a Kia.[5] The Complainant also identified the four-door sedan referenced above as the vehicle belonging to Hawkins.

During a post-arrest, post-*Miranda* custodial interview, Holmes admitted that he was present when the Complainant was brutally assaulted by people who were looking for something and asking where the "stuff" was at. Holmes also alleged that the Complainant told him that someone called her and threatened her life if she ever told anyone what happened. Holmes said during his interview that the Complainant was "very scared."

During a post-arrest, post-*Miranda* custodial interview, Hill indicated that he was friends with Dirty.[6] Hill also confirmed that, after Dirty was killed, he attended Dirty's vigil. Hill claimed that he attended the vigil and then went home.

Historical cell site data indicates that, on April 21, 2021, the Complainant's phone was near 800 Southern Avenue before traveling to Maryland. The phone was in Suitland, Maryland from approximately 1:31 a.m. to 1:45 a.m. Afterwards, cell site data places the phone again in the vicinity of Southern Avenue, Washington, D.C.

Federal search warrants authorized in the District of Columbia were executed upon arrest for Allgood, Holmes, Hawkins, and Hill.  As a result of those search warrants, numerous electronic devices were recovered, to include the following: (1) a cell phone belonging to Allgood and utilizing the phone number 301-XXX-3256; (2) a cell phone belonging to Holmes and utilizing the phone number 202-XXX-8431; (3) a cell phone belonging to Hawkins and utilizing the phone number 202-XXX-7635; (4) and a cell phone belonging to Hill and utilizing the phone number 202-XXX-8395.

---

[4] In previous interview, the Complainant has described Target 5 as both "dark-skinned" and "light-skinned."

[5] On June 2, 2021, an FBI Special Agent observed Holmes driving the Ford Escape. On June 7, 2021, an FBI Special Agent observed Holmes' girlfriend exiting the same Ford Escape in the parking lot of XXX Southern Ave, Southeast. Law enforcement investigation has revealed that this individual may not actually be Holmes' girlfriend.

[6] Dirty is the decedent mentioned above, the Complainant's ex-boyfriend. His real name is Kerry Odoms and an investigation into his murder is ongoing. One arrest has been made.

Evidence gathered from Hill's phone reveals that Hill knew Holmes and Allgood before the night of the offense. Metadata from Hill's phone indicates that, on April 17, 2021, the three were photographed together. Later that same morning, the morning of April 17, 2021, Hill posed in a picture with Allgood and Holmes in which Allgood is holding a firearm.

Further, evidence gathered from defendant Hawkins' phone reveals that Allgood, Holmes, Hawkins, Hill, and Target 5 were together near the D.C. Waterfront on the night of the offense, April 20, 2021 at approximately 11:24 p.m.

According to metadata gathered from Hill's phone, on April 21, 2021, at approximately 2:23 a.m., Hill (202-XXX-8395) texted a number belonging to Holmes (202-XXX-8431), stating "I'm in bro." According to metadata gathered from Hill's phone, on April 21, 2021, at approximately 2:43 a.m., Hill took a picture of himself holding a firearm, pointing it at the camera.

**PROCEDURAL HISTORY**

On June 14, 2021, Magistrate Judge G. Michael Harvey in the United States District Court for the District of Columbia authorized a criminal Complaint and corresponding arrest warrants for the following defendants and counts: As to defendants DeMarco Allgood, Nathaniel Holmes, and Malik Hill, kidnapping, in violation of Title 18, United States Code, Section 1201(a); as to defendant Donaesha Hawkins, kidnapping, in violation of Title 22, D.C. Code, Section 2001; as to defendant Nathaniel Holmes, First Degree Sexual Abuse, in violation of Title 22 D.C. Code, Section 3002. Defendant Hill was arrested on June 15, 2021. Defendants Allgood, Holmes, and Hawkins were arrested on June 16, 2021.

On June 21, 2021 a federal grand jury returned an Indictment charging the defendants as follows: As to defendants DeMarco Allgood, Nathaniel Holmes, and Malik Hill, kidnapping, in violation of Title 18, United States Code, Section 1201(a)(1); as to defendant Donaesha Hawkins, kidnapping, in violation of Title 22, D.C. Code, Section 2001; as to defendant Nathaniel Holmes, First Degree Sexual Abuse, in violation of Title 22 D.C. Code, Sections 3002(a)(1) and (a)(2).

On June 23, 2021, Magistrate Judge Zia M. Faruqui ordered Allgood, Holmes, and Hill held without bond. Defendant Hawkins was released into the High Intensity Supervision Program.

U.S. District Court Judge Randolph D. Moss has denied subsequent motions to revoke detention filed by defendants Allgood, Holmes, and Hill.

**DNA ANALYSIS OF SEXUAL ASSAULT KIT**

In the context of investigating the crime, a sexual assault examination was conducted at Children's National Medical Center. In addition to the bruising and lacerations noted above, a more thorough list exists in the records: the SANE noted bruising behind the Complainant's right ear, bruising

and swelling to lips, a small laceration to the right upper lip, a patterned bruise on her right upper arm, an abrasion on her right forearm, and a small bruise to her right upper back.[7]

The sex assault kit was submitted to Body Technology for testing. That kit contained the following swabs: vaginal/cervical (E01), external genitalia (E02), anorectal (E03), oral (E04), and neck (E05). The kit also contained a known blood sample from the Complainant.

The results of that testing were as follows:

The DNA profile obtained from the sperm fraction of sample E01 is consistent with the Complainant.

The DNA profile obtained from the epithelial fraction of sample E01 is consistent with the Complainant.

The partial DNA profile obtained from the sperm fraction of sample E02 (external genitalia) is consistent with a mixture of at least two individuals, including at least one male contributor. However, due to the limited data obtained, no conclusions could be made on this mixture profile.

The DNA profile obtained from the epithelial fraction of sample E02 (external genitalia) is consistent with a mixture of two individuals, including the Complainant and a "foreign" contributor for which gender could not be determined. That "foreign" profile is suitable for comparison.

No DNA profile was obtained from the sperm fraction of sample E03.

The DNA profile obtained from the epithelial fraction of sample E03 is consistent with a mixture of two individuals, including the Complainant and a male contributor. This mixture profile was interpreted assuming two contributors. Only Contributor 1 is suitable for interpretation. Due to the limited data obtained, no conclusions can be made on the uninterpretable Contributor 2 alleles.

The DNA profile obtained from the sperm fraction of sample E04 is consistent with the Complainant.

The DNA profile obtained from the epithelial fraction of sample E04 is consistent with the Complainant.

The DNA profile obtained from sample E05 (neck) is consistent with a mixture of two individuals including the Complainant and a male contributor. This mixture profile was interpreted assuming two contributors. The male profile is suitable for comparison.

---

[7] Additionally, medical providers determined that a CT scan and other, additional x-rays were necessary. Those results were negative. Finally, the Complainant's lab results showed a presumptive positive for marijuana and opiates. The government does not at this time have any information regarding whether the presumptive positive for opiates is related to medications received at the hospital.

The sexual assault kit was tested for potential DNA, consistent with the policies of the Metropolitan Police Department and Bode Technology. This evidence is awaiting further testing at the Bode laboratory. The government now seeks to obtain a buccal swab from the defendant to compare the defendant's DNA to the interpretable DNA profiles that were identified as not consistent with the Complainant.

In my training and experience, in physical and sexual assaults, assaults where physical contact occurs, DNA is often left on the Complainant and later recovered during the sexual assault examination. Based upon the facts of the case, there an evidentiary nexus between the recovered evidence and the individual whose DNA is sought because, according to the Complainant, defendant Malik Hill participated in the physical assault and kidnapping of her.

There are profiles which are not consistent with the Complainant and which are suitable for comparison, and the inclusion or exclusion of defendant Malik Hill will further assist law enforcement in defining the defendant's participation and role in the above-described offenses. That is, a match between the defendant's DNA and those samples would make a fact of consequence in this case – the defendant's kidnapping of the Complainant – more or less probable.

**PROBABLE CAUSE:**

There is probable cause to search the defendant for a buccal sample because there is a fair probability that defendant Malik Hill's DNA is evidence of the crime of kidnapping, in violation of Title 18, United States Code, Section 1201(a)(1). Therefore, I respectfully request that a search warrant be issued permitting members of the Metropolitan Police Department, members of the Federal Bureau of Investigation, members of the United States Marshal Service, and/or the D.C. Department of Forensic Sciences to take a buccal swab from defendant Malik Hill.

Date: September 9, 2021

ERIC WALSH
Detective, Metropolitan Police Department

*Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September 9, 2021.*

ZIA M. FARUQUI
MAGISTRATE JUDGE
FOR THE DISTRICT OF COLUMBIA

11